UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

W.Q., a West Virginia resident
whose identity is being withheld
for purposes of confidentiality,

     Plaintiff

v.                                    CIVIL ACTION NO. 2:04-0373

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURG, PA,
a foreign corporation,

     Defendant

MEMORANDUM OPINION AND ORDER

       This matter is before the court on the motion of
defendant, filed December 21, 2004, for summary judgment, and the
four motions of plaintiff, also filed December 21, 2004, for
partial summary judgment on the following issues: the preclusion
of defendant from relying upon or asserting any coverage issues
other than those found in its March 6, 2003, denial letter to
Maxwell Lewis ("Pl. Mot. No. 1"); defendant's duty to provide a
defense to Lewis under three or more coverages, including B, C,
and E ("Pl. Mot. No. 2"); defendant's obligation to provide Lewis
a defense under "Coverage C – Professional Liability Insurance"

("Pl. Mot. No. 3"); and defendant's obligation to provide Lewis a
defense under "Coverage E - Wrongful Act Liability Insurance"
("Pl. Mot. No. 4").

                              I.

        Plaintiff filed this action for declaratory judgment on
April 19, 2004, seeking a determination that defendant was
obligated to provide indemnification or a defense to Max Lewis in
the Circuit Court of Kanawha County, West Virginia Civil Action
No. 03-C-351, a case in which Lewis was accused of professional
and sexual misconduct in the course of his employment with
Prestera Center ("Prestera").  (Compl. ¶¶ 11-12, ad damnum.)
Lewis entered into a consent judgment in that case in the amount
of $2 million, and the state circuit court entered an order
approving the consent judgment on April 11, 2003.  (Compl. ¶ 38.)
Plaintiff seeks to collect $2 million, plus interest, here.
(Compl., ad damnum.)

        Plaintiff filed her state court complaint against Lewis
and Prestera Center on February 19, 2003, and filed an amended
complaint the following day.  (Pl. Exhs. 17 and 18.)  She stated
that she sought mental health treatment in 2002 as a resident of

                              2

Prestera, where Lewis was assigned the role of her case manager.[1]
(Feb. 20, 2003, am. compl. filed as Pl. Exh. 18, ¶¶ 4-5.)
Plaintiff alleged that, while she was receiving treatment at
Prestera, she began to trust defendant Lewis and eventually
became "emotionally vulnerable [and] easily manipulated" by him.
(Pl. Exh. 18, ¶¶ 6-7.)  She asserted that, after her release from
Prestera, Lewis began to conduct improper, unsupervised visits to
her residence, "where he attempted to persuade her to consume
pharmaceuticals and alcohol and to engage in sexual behavior."[2]
(Pl. Exh. 18, ¶ 10.)  After she rebuffed his overtures, plaintiff
said, defendant took her to his apartment "where he mentally,
physically and sexually assaulted and abused her . . ."  (Pl.
Exh. 18, ¶ 11.)  He then gave her a greeting card telling
plaintiff that she had "good potential as a slave girl," she
declared.  (Pl. Exh. 18, ¶ 12.)

Plaintiff avers that Lewis drove her home after the
encounter at his apartment, and that she immediately called 911
emergency services (Dep. Tr. of W.Q., appended as Exh. 7 to Pl.

---

[1]  Plaintiff entered Prestera's Crisis Residential Unit on
August 11 or 12, 2002.  (Pl. Statement of Facts at 6; Def. Mem.
at 5.)

[2]  Plaintiff was discharged from Prestera on August 20,
2002.  (Pl. Statement of Facts at 12.)

3

Statement of Facts, at 307.) and reported to the hospital for evaluation (Pl. Statement of Facts at 20).  Soon thereafter, she reported Lewis's behavior, without divulging his name, to her treating clinical social worker, who reported the incident to Paul Hall of Prestera.  (Memorandum of Paul W. Hall to Bob Hansen, appended as Exh. 10 to Pl. Statement of Facts.)  On September 3, 2002, plaintiff met with her social worker and later with Hall, to whom she reported Lewis's conduct.  (<u>Id</u>.)  Hall also was informed by Adult Protective Services[3] that it had received a report about Lewis, and that the police had been notified.  (<u>Id</u>.)

Hall met with Lewis immediately within hours of receiving the report from Adult Protective Services.  (<u>Id</u>.) Lewis admitted to Hall that he had gone to plaintiff's home, that the two developed a "rapport" while she was an inpatient at Prestera's Crisis Residential Unit, and that he sought her support and comfort for his own stresses and problems.  (<u>Id</u>.)  He also informed Hall that he and plaintiff had engaged in "consensual" sexual activity.  (Dep. Tr. of Paul Hall, appended as Exh. L to Def. Mem., at 33.)  On Hall's recommendation,

---

[3]     Presumably, plaintiff is referring to a division of the West Virginia Department of Health and Human Resources' Office of Social Services.

Prestera terminated Lewis's employment on September 3, 2002, for "gross misconduct."  (Def. Mem. Exh. L at 36-38.)

On December 24, 2002, plaintiff's counsel in the state action forwarded copies of her notice of claim and screening certificate of merit to Prestera and Lewis as required by W.Va. Code § 55-7B-6.[4]  (Pl. Statement of Facts at 22.)  The complaint initiating the state action was filed February 19, 2003.  By letter dated March 6, 2003 ("the March 6th letter"), AIG Claim Services, Inc. ("AIG"), the insurance carrier for Prestera and an authorized representative of National Union Fire Insurance Company, informed Lewis that it disclaimed coverage or indemnification and that it declined to provide him a defense. (Pl. Exh. 20.)  According to the letter, AIG was not obligated to provide coverage to Lewis under "Coverage E" of Prestera's policy for wrongful act liability because Lewis was excepted by "Exclusion C," which rejects claims "brought about or contributed

---

[4]    "At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation.  The statement shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices are being sent, together with a screening certificate of merit.  . . ."  W.Va. Code § 55-7B-6 (2003).

5

to by fraud, dishonesty or criminal act of any 'insured'." (Id.)
AIG informed Lewis in the March 6th letter that Exclusion C
applied to him because he had "admitted to engaging in an
inappropriate relationship with the plaintiff, involving sexual
contact." (Id.) No representative of AIG or National Union
contacted Lewis at any time to discuss the allegations against
him. (Pl. Statement of Facts at 24.)

After Lewis's deadline to respond to the state court
complaint passed without his filing an answer, plaintiff filed a
motion for default judgment on March 25, 2003, which was granted
by order dated April 3, 2003, pursuant to Rule 55 of the West
Virginia Rules of Civil Procedure. (Pl. Statement of Facts at
24; Pl. Exh. 23.) On April 10, 2003, Lewis agreed to an order of
consent judgment in the amount of $2 million "in an effort to
avoid costly, time consuming and emotionally devastating
litigation that [he could not] afford financially, emotionally,
or mentally." (Pl. Exh. 13 at ¶ 48.) He did so with the
understanding that plaintiff would attempt to collect the
judgment from any available insurance policy before seeking
remuneration from Lewis. (Pl. Statement of Facts at 25, 27.) An
order of consent judgment was entered by the state court on April

6

10, 2003, and an amended order followed on April 11, 2003.[5]  (<u>Id</u>. at 27; Pl. Exh. 24.)

Plaintiff filed the complaint initiating this action on April 19, 2004.  She seeks to collect $2 million from defendant in satisfaction of the consent judgment entered in the state court action.

Defendant filed, on December 21, 2004, its motion for summary judgment, in which it argues that Lewis was not acting within the scope of either his employment or of his duties during his encounters with plaintiff after her discharge from Prestera, and coverage therefore is not available to him.  (Def. Mem. at 9-10.) It further argues that the consent judgment is unenforceable, inasmuch as the agreement was likely "procured by fraud or collusion," and because the $2 million to which Lewis agreed is unreasonably high, evidenced by his having engaged in no discovery prior to agreeing to that amount.  (Def. Mem. at 24-25.)  As earlier noted, plaintiff filed her four motions for partial summary judgment on December 21, 2004.

---

[5]      The only apparent change in the amended order is the addition of the word "two" before the word "million" in the second paragraph of the order at page one.

II.

A party is entitled to summary judgment "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  Material facts are those necessary to
establish the elements of a party's cause of action.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue
of material fact exists if, in viewing the record and all
reasonable inferences drawn therefrom in a light most favorable
to the non-moving party, a reasonable fact-finder could return a
verdict for the non-movant. Id.  The moving party has the burden
of showing -- "that is, pointing out to the district court --
that there is an absence of evidence to support the nonmoving
party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325
(1986).  If the movant satisfies this burden, then the non-movant
must set forth specific facts as would be admissible in evidence
that demonstrate the existence of a genuine issue of fact for
trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is
entitled to summary judgment if the record as a whole could not

8

lead a rational trier of fact to find in favor of the non-moving party. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

9

III.

A.  **The Policy**

Defendant issued a policy of liability insurance to the State of West Virginia effective from July 1, 2002, through July 1, 2003.  (Pl. Exh. 27.)  Prestera was designated an "Additional Insured" under that policy.  (<u>Id</u>. at 1.)  The policy limits were $1 million per occurrence, regardless of how many coverages may have applied or whether a claim was asserted against more than one insured.  (<u>Id</u>.)  "Other insureds" under the policy include the "members of the governing body of the Additional Insured . . ., its elected or appointed officials, executive officers, directors, commissioners, board members, volunteer workers, student teachers, and employees . . . while acting within the scope of their duties as such."  (<u>Id</u>. at 2.)  It is undisputed that Lewis was an employee of Prestera, an "additional insured," at the time of the events giving rise to plaintiff's state court action.  He was, therefore, an "other insured" if he was acting within the scope of his employment duties at the time of the events giving rise to plaintiff's cause of action.

10

B.    **The March 6th Denial Letter**

        In its March 6th letter, AIG specifically refused to
apply "Coverage E" of Prestera's policy for wrongful act
liability to Lewis, explaining that Lewis was excepted by
"Exclusion C," because he had "admitted to engaging in an
inappropriate relationship with the plaintiff, involving sexual
contact."  Plaintiff argues that defendant is "estopped" from
asserting herein that any exclusions under policy coverages other
than Coverage E apply, or from asserting any other exclusions
under Coverage E itself.[6]  (Pl. Mot. No. 1 at 4.)

        In support of her argument, plaintiff cites <u>Potesta v.
United States Fidelity & Guaranty Company</u>, 504 S.E.2d 135 (W.Va.
1998).  Answering certified questions from the United States
Court of Appeals for the Fourth Circuit, the West Virginia
Supreme Court held that

                in order to rely on the doctrine of estoppel
                to prevent an insurer, who has previously
                stated one or more reasons for denying
                coverage, from asserting other, previously

        [6]    Plaintiff concedes that the doctrine of waiver is
inapplicable here (Pl. Mot. No. 1 at 5), inasmuch as "implied
waiver may not be utilized to prohibit the insurer's subsequent
denial based on the nonexistence of coverage."  <u>Potesta v. United
States Fidelity & Guaranty</u>, 504 S.E.2d 135, 150 (W.Va. 1998).

> unarticulated reasons for denying coverage,
> the insured must prove that s/he was induced
> to act or to refrain from acting to her/his
> detriment because of her/his reasonable
> reliance on the previously stated grounds for
> declination.

Potesta, 504 S.E.2d at 144 (emphasis omitted).  Plaintiff states

that, at the writing of the March 6th letter, defendant knew that

plaintiff was asserting a "professional liability" claim against

Lewis, based on the screening certificate of merit that plaintiff

had earlier sent to the defendants with her notice of claim in

December 2002.  (Pl. Mot. No. 1 at 6.)  Plaintiff further argues

that defendant's actions in denying coverage to Lewis were

"fraught with bad faith" (Pl. Mot. No. 1 at 6) and that Lewis

"detrimentally relied" on defendant's representations that

insurance coverage was unavailable to him "by deciding to enter

into a consent judgment with" plaintiff (Pl. Mot. No. 1 at 9).

Plaintiff suggests that her case in analogous to Pasha

v. The Rosemount Memorial Park, 781 A.2d 1119 (N.J. App. 2001),

wherein an insurer was "estopped from denying coverage on grounds

that were not presented in its presettlement letter disclaiming

liability" because the insured made a decision to enter into a

settlement agreement and assign its rights to the plaintiff after

receiving notice of denial.  Pasha, 781 A.2d at 1121.  The court

said that the decision "could reasonably have been based on their

12

belief that the reasons given by the insurer for declining
coverage were without merit and would ultimately be rejected in
the ensuing litigation."  Pasha, 781 A.2d at 1125.

Lewis does not appear to have had a reasonable belief
that the insurer's reasons for declining coverage were meritless.
In its March 6th letter, AIG informed Lewis that he fell within
an exemption from "wrongful acts" coverage that excluded "[a]ny
claim brought about or contributed to by fraud, dishonesty or
criminal act of any 'insured.'" (Policy, Pl. Exh. 27 at 15.)  It
seems very likely that Lewis was aware that his off-site,
unsupervised visits with plaintiff were "dishonest"[7] inasmuch as
his engaging in those meetings directly violated at least one of
Prestera's employment policies.  Its "Professional Relationship"
policy

> is designed to protect current and former
> clients and their families, who should be
> considered emotionally vulnerable, and the
> employee's professional reputation.  Any
> contact of a personal or intimate nature by
> any employee shall be considered as risking
> an adverse effect on the treatment and
> prognosis of said client and shall be viewed
> as exploitation, which shall be cause for

---

[7]    The definition of dishonesty includes "a lack of
honesty or integrity" (Webster's New Collegiate Dictionary
(1977).)  Integrity is, among other definitions, "firm adherence
to a code of esp. moral or artistic values."  (Id.)

13

> immediate disciplinary action as severe as
> dismissal.
>
> Employees of Prestera are required to abstain
> from establishing intimate, personal,
> financial or business relationships with
> clients, or family members of clients, while
> the client is actively participating in
> services and for at least a one year period
> after the client has discontinued or been
> released from services.

("Professional Relationship Policy," appended as Exh. J. to Def.

Mem.)  This policy specifically forbids certain actions,

including personal telephone calls or visits to clients, dating,

sexual relationships, and inappropriate physical contact.  (Id.)

Lewis acknowledged his awareness of the Professional Relationship

policy by signing a photocopy on April 24, 2002, nearly four

months before plaintiff was admitted to Prestera's Crisis

Residential Unit.  (Id.)  On the same date, he also acknowledged

receipt of another policy meant to protect employees' and

clients' "right to a work environment free from intimidation and

harassment."  ("Sexual Harassment Policy," appended as Exh. K to

Def. Mem.)

In an affidavit dated April 4, 2003, Lewis acknowledged

that he had been aware of the "impropriety" of his conduct and he

stated, "I now understand that all of this conduct was morally,

ethically and professionally wrong.  In fact, I understood it was

14

wrong at the time, but I was very emotionally confused." (Pl. Exh. 13, ¶¶ 14, 37.) He also recognized that both his account and plaintiff's account of the situation "present[] an obvious breach of [the] applicable standard of care." (Pl. Exh. 13, ¶ 51.) Lewis expressed his understanding that his entering the consent judgment did not guarantee that plaintiff would not seek damages from him. (Pl. Exh. 13, ¶ 55.) Lewis's statements show that he was cognizant of his personal liability both at the time he engaged in conduct affecting plaintiff and at the time he agreed to the consent judgment.

Moreover, it cannot be ignored that Lewis consented to judgment only after having had a default judgment order entered against him. It appears then that Lewis's motivation in agreeing to the consent judgment was an attempt to evade damages, where liability already had been assigned by the entry of default. A default judgment is essentially a conclusive admission avoidable only by setting aside the default for good cause and in accordance with Rule 60(b). See W.Va. R. Civ. P. 55(c). Lewis made no attempt to set aside the default judgment.

Given Lewis's understanding at the time of entering the consent judgment that his conduct violated his employer's policies and thus likely was "dishonest" within the meaning of

15

the coverage exclusion, as well as his clear statement that he was aware that the responsibility for payment of any judgment could be his, plaintiff has not shown that Lewis detrimentally relied on the March 6th denial letter.  Because plaintiff has not shown detrimental reliance, defendant is not precluded from asserting defenses not specifically asserted in the March 6th letter.

C.    Applicability of Coverage

       Plaintiff argues that defendant was obligated to provide a defense to Lewis under at least one of three subheadings found in Section I of Prestera's liability insurance policy: Coverage B for personal injury[8];

---

[8]     Coverage B provides, in part:

       1.    Coverage - Personal Injury Liability

       The Company will pay on behalf of the "insured" all sums which the "insured shall become legally obligated to pay as "damages" because of injury (herein called "personal injury") sustained by any person or organization and arising out of one or more of the following "offenses" committed in the conduct of the "Named Insured's" business:

       Group A - False arrest, detention or imprisonment, "corporal punishment" or malicious prosecution

       Group B - The publication or utterance of a

16

Coverage C for professional liability[9], or Coverage E for

_____

                    libel or slander or of other
                    defamatory or disparaging material,
                    or a publication or utterance in
                    violation of an individual's right
                    to privacy;

          Group C - Wrongful entry or eviction, or
                    other invasion of the right of
                    private occupancy.

(Policy, filed as Pl. Exh 27, at 9.)

     [9]      Coverage C provides, in part:

          1.   Coverage - Professional Liability

          The Company will pay on behalf of the
          "insured" all sums which the "insured" shall
          become legally obligated to pay as "damages"
          because of injury to any person arising out
          of the rendering of or failure to render,
          during the policy period any professional
          services, and the Company shall have the
          right and duty to defend any suit against the
          "insured" seeking such "damages", even if any
          of the allegations of the suit are
          groundless, false or fraudulent, and may make
          such investigation and, with the written
          consent of the Board of Risk and Insurance
          Management of The State of West Virginia,
          such settlement of any claim or suit as it
          deems expedient . . . .

(Policy, filed as Pl. Exh. 27, at 11.)

wrongful acts[10].   (Pl. Mot. No. 2.)

_____

[10]    Coverage E provides, in part:

1.    Coverage - Wrongful Act Liability
       Insurance

The Company will pay on behalf of the
"insureds," individually or collectively, or
their executors, administrators or assignees,
in accordance with the terms of this coverage
part, all sums which said "insureds" shall
become legally obligated to pay as damages
for a "loss" arising from any "Wrongful Act"
of the "insured" or of any other person for
whose actions the "insured" is legally
responsible, and the Company shall have the
right and duty to defend any suit against the
"insured" seeking such damages, even if any
of the allegations of the suit are
groundless, false or fraudulent, and may make
such investigation and, with the consent of
the Board of Risk and Insurance Management of
The State of West Virginia, such settlement
of any claim or suit as it deems expedient
.  .  .  .

(Policy, filed as Pl. Exh 27, at 15.)   Exclusion C to Coverage E
excepts:

Any claim brought about or contributed to by
fraud, dishonesty or criminal act of any
"insured"; however, notwithstanding the
foregoing, the "insured" shall be protected
under the terms of this coverage part as to
any claims upon which suit may be brought
against them by reason of any alleged fraud,
dishonesty or criminal act on the part of any
"insured(s)", unless a judgment or other
final adjudication thereof adverse to such
"insured(s)" shall establish that acts of
active or deliberate fraud, dishonesty or

18

Defendant argues that it was not obligated to provide coverage under any part of the policy because Lewis was not acting within the scope of either his employment or of his duties in the course of his conduct toward plaintiff after her discharge from Prestera. Each Coverage B, C, and E contains a provision defining "persons insured," specifying that an employee is an insured only "while acting within the scope of his [or her] duties as such." (Policy, Sec. I, Coverage B(3)(B); Coverage C(3)(C); and Coverage E(3)(C).

Plaintiff suggests that the phrase "scope of their duties" is undefined and ambiguous in the policy and thus should be construed in favor of coverage. (Pl. Mot. 3 at 7-8.) She does not suggest any meaning for the phrase. It seems apparent, however, that the phrase has plain meaning not requiring the court's construction. The court agrees with defendant's argument that the term "scope of duties" likely sets narrower boundaries than "scope of employment," which has been addressed by the West Virginia Supreme Court. (Def. Resp. at 10.) That court has held that an act likely is considered to have been undertaken in the course of employment if

> criminal act committed by such "insured(s)"
> or unless there was an admission of guilt by
> the insured".

19

> (1) it is something fairly and naturally
> incident to the business and (2) it is done
> while the servant was engaged upon the
> master's business and is done, although
> mistakenly or ill-advisedly, with a view to
> further the master's interests, or from some
> impulse or emotion which naturally grew out
> of or was incident to the attempt to perform
> the master's business and did not arise
> wholly from some external, independent and
> personal motive on the part of the servant to
> do the act upon his own account.

**State ex. rel. Clay Foodland v. West Virginia Department of**

**Health and Human Resources**, 532 S.E.2d 661, 665 (W.Va. 2000).

Lewis was a self-described "paper-shover" for Prestera.

(March 26, 2003, tr. of videotaped statement of Max Lewis,

appended as Exh. S to Def. Mem., at 5.)  His formal job

description as a case manager was defined in a memoranda dated

June 18, 2002, as follows:

> Summary:  Provides clinical, casework, and
> group work services to individuals and their
> families by performing the following duties.
>
> Essential Duties and Responsibilities:
> include the following. Other duties may be
> assigned.
>
> Interviews clients in crisis situations
> involving social, emotional, health, or other
> problems to develop background and details of
> problems.
>
> Assesses and evaluates cases and prepares and
> implements treatment and case management
> plans.

20

Counsels clients, assisting them to identify
and resolve problems and make effective use
of resources.

Links and identifies clients to support
groups.

Works closely with families of clients and
provides appropriate clinical services to
family members including individual
counseling and group work such as family
support groups.

Maintains working relationships with staff of
other agencies and institutions, homes, and
facilities, and acts as liaison between
clients and agency or institution.

Develops and maintains contact with staff of
other agencies and institutions, homes,
facilities, and acts as liaison between clients and agency or ins

Develops and maintains contact with other
agency staff and local service providers to
develop specialized services for clients and
their families.

Encourages clients to do things for
themselves to retain feelings of independence
and self-esteem.

Provides consultation to staff on specific
cases.

Prepares and maintains written case records,
reports, and forms, performs case follow-up
and closing, and performs otheradministrative
tasks as required.

Responsible for the contents of the clinical
record of persons served.

21

Supervisory Responsibilities:

This job has no supervisory responsibilities.

(June 18, 2002, Case Manager Job Description, appended as Exh. O to Def. Mem., emphasis omitted.)

Lewis's testimony regarding his job tends to show that he had less actual client interaction than the job description might imply. Lewis testified that he was responsible for completing forms when patients presented for treatment, and that he "merely categorized what their presenting problems were on a form sheet . . . that was later transferred or transcribed by the therapist to get the detailed therapy in order." (Dec. 5, 2003, Dep. Tr. of Maxwell Lewis, appended as Exh. R to Def. Mem., at 20.) He did not exercise independent judgment in determining what questions should be asked during the intake process. (Id. at 21.) Lewis also distributed handouts to patients and prepared movies for viewing. (Exh. R at 30; Exh. S at 5-6.)

Plaintiff suggests that Lewis actually conducted group sessions, "individual supportive sessions," and that he "was very involved in the day to day treatment of patients." (Pl. Resp. at 14.) In response to questioning by plaintiff's counsel, Prestera

program director Sheila Edwards testified that group sessions that would have been conducted by Lewis were not therapeutic in nature, but that Lewis was "very involved" in the day-to-day treatment of patients, and patients were encouraged to communicate openly with their case managers.  (Dep. Tr. of Sheila Edwards, Pl. Exh. 3, at 51, 53, 106.)  She qualified those statements, however, by saying that "[t]he case manager was not the therapist, so I don't recall ever telling anyone to open up to the case manager, but certainly when they do the admission packet, including the Medicaid paperwork, they definitely ask a lot of open-ended questions, and you did expect the patients to be honest with those answers."  (Id. at 54.)  Plaintiff also cited the testimony of Paul Hall, Prestera's Director of Adult Mental Health Services, to show that Lewis would be involved in "the treatment team for patients."  (Pl. Resp. at 14.)  Hall testified, though, that he was "not really sure what Sheila Edwards had [] Lewis doing at the [Crisis Residential Unit], so [Edwards] would be best to answer exactly what kind of activities he was performing."  (Dep. Tr. of Paul Hall, appended as Exh. F to Def. Mem. at 49.)  Edwards testified that Lewis did not conduct any kind of therapy.

Defendant relies on Prestera's treatment notes to show
that Lewis's documented contact with plaintiff during her eight-
day stay at Prestera totaled eight hours and fifteen minutes,
nearly all in group settings. (Dep. Tr. of Fred Jay Krieg,
appended as Exh. U to Def. Mem., at 127.)  The only one-on-one
contact between the two in that time was a period of
approximately one hour and fifteen minutes on the day of
plaintiff's admission during which Lewis assisted her with
completion of a form.  (Id.)  The group sessions that Lewis
facilitated included audio recorded presentations related to
stress management and relaxation techniques, a video recorded
presentation of the movie "A Beautiful Mind," and a beginners'
instructional video for Chi.  (Prestera Treatment Notes, Pl. Exh.
6 at 92, 115, 124, 127.)  It appears clear that Lewis's duties,
at least insofar as related to plaintiff, were purely
administrative and involved little or no interaction or mental
health counseling.

Lewis conceded during questioning by defendant's
counsel that his visitation of patients after their discharge
from Prestera was "not . . . in furtherance of Prestera's
business."  (Exh. R at 50.)  Indeed, based upon the case manager
job description and Lewis's acknowledged violation of a key

employment policy, it is quite apparent that Lewis did not act within the scope of his employment duties in his interactions with plaintiff.  Not only was his interaction with plaintiff after her discharge in furtherance of his own interests, but it also violated Prestera's unequivocal policy prohibiting his contact with potentially "emotionally vulnerable" patients, former patients, and their families, to the point of being labeled "exploitation" by that policy.  ("Professional Relationship Policy," appended as Exh. J. to Def. Mem.)   Lewis's off-duty, off-site visits to plaintiff were not "incident" to the business of Prestera, but instead were directly counter to its interests.

Plaintiff argues, however, that Lewis's first visit to her apartment was precipitated by her telephone call requesting that he visit her residence and "provide her with professional advice, guidance, and support."[11]  (Pl. Statement of Facts at 14.)  Of course, plaintiff provided no such support and according

---

[11]      Plaintiff relies on Lewis's testimony to support her contention.  Her own testimony does not support the assertion that she contacted Lewis or requested his company, either professionally or socially.  (Dep. Tr. of W.Q., Pl. Exh. 7 at 249, 251.)  Rather, she testified that on the first occasion that Lewis visited her apartment, he appeared unannounced with a six-pack of beer and told her that he had to "do a follow-up" and inspect her living area.  (Id. at 253-57.)

to his own testimony, his visits were not for the benefit of
Prestera's business.  But plaintiff asserts that her request
supports an argument that Lewis was a "mental health provider"
subject to the "transference phenomenon" (Pl. Resp. at 3), which
describes "a patient's emotional reaction to a therapist and is
generally applied to the projection of feelings, thoughts and
wishes on to the analyst." (Pl. Mot. No. 3).  She argues that
when a mental health provider "mishandles" the transference
phenomenon by becoming sexually involved with a patient, the
provider's conduct is considered to have occurred in the scope of
his duties.[12]  (Pl. Resp. at 3-4.)  Defendant responds by
pointing out that the transference phenomenon is specific to
professional therapists and does not apply to mental health
workers generally.  (Def. Reply at 7.)

       The West Virginia Supreme Court of Appeals has
discussed the transference phenomenon, noting that it is based on
"the emotional bond that forms between a <u>therapist</u> and his

---

[12]     Plaintiff advances this argument in her motion for
partial summary judgment on defendant's obligation to provide a
defense and coverage under Coverage C – Professional Liability
Insurance (Pl. Mot. No. 3), ignoring that she must first pass the
hurdle of showing that Lewis was an insured under the policy.
Inasmuch as finding the transference phenomenon applicable
arguably could lead to a finding that Lewis was acting in the
scope of his duties, the court considers plaintiff's argument in
the context of whether Lewis is an insured under the policy.

patient."  Sisson v. Seneca Mental Health/Mental Retardation
Council, Inc., 404 S.E.2d 425, 429 (W.Va. 1991)(emphasis
supplied).  Plaintiff has cited no case law, and the court has
located none, in which the transference phenomenon has been
applied to a provider other than one formally engaging a patient
in psychotherapy.

Plaintiff has provided no reason that the court should
extend the transference phenomenon to matters that do not involve
the administration of psychotherapy, particularly where, as here,
the evidence shows that Lewis's duties as plaintiff's case
manager were essentially clerical and his interaction with
plaintiff was limited.  There is no evidence that it was within
the scope of Lewis's duties to act as a therapist toward
plaintiff or any other patient of Prestera.  Moreover, the
evidence shows that Prestera assigned Lewis no duties that would
foster the "emotional bond" contemplated by the West Virginia
Supreme Court in application of the transference phenomenon.
Lewis was not acting within the scope of his employment with
Prestera, and certainly not within the scope of the duties
assigned to him, when he engaged in the actions giving rise to
plaintiff's state court complaint.  Defendant was aware of
Lewis's departure from his duties from the admission he made to

Prestera director Paul Hall, concerning his having visited plaintiff at her home and having engaged in "consensual" sexual activity, after plaintiff complained about Lewis's behavior to her social worker.  Indeed, Lewis was acting while engaged in a frolic of his own, seeking sexual gratification from a vulnerable patient discharged from Prestera's care.  Because he was not acting within the scope of his duties, Lewis is not an "other insured" within the meaning of the policy, and defendant was not obligated to indemnify or provide a defense to him in the state court action.

IV.

For the reasons stated herein, it is ORDERED that:

1)   plaintiff's motion for partial summary judgment to preclude defendant from being able to rely upon or assert any coverage defenses other than those filed in its March 6, 2003, denial letter be, and it hereby is, denied;

2)   plaintiff's motion for partial summary judgment on defendant's duty to provide a defense to Max Lewis under three or more coverages, including B, C, and E, be, and it hereby is, denied;

28

3)    plaintiff's motion for partial summary judgment on
      defendant's obligation to provide a defense and coverage
      under Coverage C – Professional Liability Insurance be, and
      it hereby is, denied;

4)    plaintiff's motion for partial summary judgment on
      defendant's obligation to provide coverage under Coverage E
      – Wrongful Act Liability Insurance be, and it hereby is,
      denied; and

5)    defendant's motion for summary judgment be, and it hereby
      is, granted.

          The Clerk is directed to forward copies of this written
opinion and order to all counsel of record.

                              DATED: March 31, 2006

                              John T. Copenhaver, Jr.
                              United States District Judge